**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT | : | |
| INSURANCE CORPORATION as | : | |
| RECEIVER for COMMUNITY | : | |
| BANK & TRUST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 2:09-CV-0151-RWS |
| | : | |
| CLEVELAND MOTOR CARS, | : | |
| INC., Y&S INVESTMENTS, | : | |
| LLC, MITCH SIMPSON, and | : | |
| JAMES L. BRUCE, JR., | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Plaintiff's Motion for Summary

Judgment [75] and Defendants' Motion to Strike Affidavit of Robert K. Beaty

in Support of Plaintiff's Motion for Summary Judgment ("Motion to Strike")

[89].  After reviewing the record, the Court enters the following Order.

### Background

This is a suit brought by Plaintiff Federal Deposit Insurance Corporation

as Receiver ("Plaintiff" or "FDIC-R") for Community Bank & Trust ("CBT")

to recover under promissory notes and guaranty agreements executed by Defendants.  The facts are as follows.

CB&T was a state bank chartered under the laws of Georgia, and its deposits were insured by the Federal Deposit Insurance Corporation.  (Pl.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. ("Pl.'s Statement of Material Facts" or "Pl.'s SMF"), Dkt. [75-2] ¶ 2.)  On January 29, 2010, the Commissioner of the Georgia Department of Banking and Finance closed CB&T, and the Federal Deposit Insurance Corporation was appointed as Receiver.  (Id.)  As receiver, FDIC-R has succeeded to all rights, titles, powers, and privileges of CB&T and "stands in the shoes of CB&T with respect to all matters, including litigation by and against CB&T."  (Id.)  Thus, FDIC-R is the real party in interest for the financial institution formerly known as CB&T.  (Id.)

A.     The Notes and Guaranties

FDIC-R seeks to recover under four promissory notes and three guaranty agreements entered into by and between CB&T and Defendants: (1) the Cleveland Motor Note; (2) the Y&S Note; (3) the Simpson Note; (4) the Bruce Note; (5) the Simpson Unlimited Guaranty of the Y&S Note; (6) the Bruce

2

Unlimited Guaranty of the Y&S Note; and, finally, (7) the Simpson Guaranty of the Bruce Note.[1]  The facts relevant to these instruments are as follows.

### 1.   *The Cleveland Motor Note*

On or about December 19, 2008, CB&T entered into a loan agreement with Defendant Cleveland Motor Cars, Inc. ("CMC") (the "Cleveland Motor Note").  (Id. ¶ 3.)  On the same date, CB&T executed and delivered to CMC the Cleveland Motor Note in the original amount of $302,200.00.  (Id. ¶ 3.)  Defendant Mitch Simpson ("Simpson"), in his capacity as President of CMC, signed, initialed, and executed the Cleveland Motor Note on behalf of CMC.  (Id. ¶¶ 4-5.)  "The Cleveland Motor Note obligates CMC to timely pay CB&T, or CB&T's successor, all amounts due under the Cleveland Motor Note, including principal, interest, and other charges due and payable thereunder (collectively the 'Cleveland Motor Note Indebtedness')."  (Id. ¶ 6.)  It further requires CMC to pay the costs and expenses of collecting the Cleveland Motor Note Indebtedness, including court costs and attorneys' fees.  (Id. ¶ 7.)

---

[1] The Court refers to the notes collectively as the "Notes" and the guaranty agreements collectively as the "Guaranties."

3

Pursuant to the terms of the Cleveland Motor Note, CB&T extended $302,200.00 to CMC.  (Id. ¶ 10.)  CMC received and enjoyed the use of those funds but failed to make all required payments on the Cleveland Motor Note. (Id. ¶ 11.)  Thus, CMC is in default under the terms of the Cleveland Motor Note for failure to make payments on the Note when due.  (Id. ¶ 12.)  FDIC-R contends that, to date, CMC has failed to cure its default.  (Id. ¶ 16.)

2.    *The Y&S Note (and Simpson and Bruce Guaranties)*

On or about February 11, 2009, CB&T entered into a loan agreement with Defendant Y&S Investments, LLC ("Y&S") (the "Y&S Note") for the amount of $6,577,490.77.  (Id. ¶ 17.)  Simpson, who at the time was Vice President of Y&S, signed, initialed, and executed the Y&S Note on behalf of Y&S.  (Id. ¶¶ 18-19.)  "The Y&S Note obligates Y&S to timely pay CB&T, or CB&T's successor, all amounts due under the Y&S Note, including principal, interest, and other charges due and payable thereunder (collectively, the 'Y&S Indebtedness')."  (Id. ¶ 20.)  It also requires Y&S to pay the costs and expenses of collecting the Y&S Indebtedness, including court costs and attorneys' fees. (Id. ¶ 21.)  Y&S's obligation to repay the Y&S Note is guaranteed by an Unlimited Guaranty executed and delivered by Simpson (the "Simpson

4

Guaranty") and an Unlimited Guaranty executed and delivered by Defendant James L. Bruce, Jr. ("Bruce") (the "Bruce Guaranty").  (Id. ¶¶ 22-23.)

Pursuant to the terms of the Y&S Note, CB&T extended $6,577,490.77 to Y&S, which received and enjoyed the use of the funds.  (Id. ¶¶ 29-30.) FDIC-R contends that Y&S, however, failed to make all required payments on the Y&S Note and, therefore, is in default.  (Id. ¶¶ 31-32.)  FDIC-R likewise contends that Simpson and Bruce are in default under the Simpson and Bruce Guaranties.  (Id. ¶¶ 36-37.)  Finally, FDIC-R contends that, to date, Y&S, Simpson, and Bruce have failed to cure their defaults under these instruments. (Id. ¶¶ 35-37.)

### 3.    *The Simpson Note*

On or about November 25, 2008, CB&T entered into a loan agreement with Simpson (the "Simpson Note") for the amount of $401,551.00.  (Id. ¶ 38.) Simpson signed, initialed, and executed the Simpson Note in his individual capacity.  (Id. ¶ 39.)  "The Simpson Note obligates Simpson to timely pay CB&T, or CB&T's successor, all amounts due under the Simpson Note, including principal, interest, and other charges due and payable thereunder (collectively, the 'Simpson Note Indebtedness')."  (Id. ¶ 40.)  It also requires

5

Simpson to pay the costs and expenses of collecting the Simpson Note

Indebtedness, including court costs and attorneys' fees.  (Id. ¶ 41.)

CB&T extended funds to Simpson in the amount of $401,551.00,

pursuant to the terms of the Simpson Note.  (Id. ¶ 44.)  Simpson received and

enjoyed the use of those funds but failed to make all required payments under

the Note.  (Id. ¶¶ 45-46.)  Thus, FDIC-R contends, Simpson is in default under

the Simpson Note for failure to make payments when due.  (Id. ¶ 47.)  FDIC-R

further contends that, to date, Simpson has failed to cure its default.  (Id. ¶ 50.)

4.    *The Bruce Note (and Simpson Guaranty of the Bruce Note)*

On or about January 23, 2009, CB&T entered into a loan agreement with

Bruce (the "Bruce Note") for the amount of $200,350.00, which Bruce signed,

initialed, and executed in his individual capacity.  (Id. ¶¶ 51-52.)  "The Bruce

Note obligates Bruce to timely pay CB&T, or CB&T's successor, all amounts

due under the Bruce Note, including principal, interest, and other charges due

and payable thereunder (collectively, the 'Bruce Note Indebtedness')."  (Id. ¶

53.)  It further requires Bruce to pay the costs and expenses of collecting the

Bruce Note Indebtedness, including court costs and attorneys' fees.  (Id. ¶ 54.)

Bruce's repayment of the Bruce Note is guaranteed by the Guaranty of Specific

6

Transaction executed by Simpson (the "Simpson Guaranty of the Bruce Note").
(<u>Id.</u> ¶ 55.)

CB&T extended to Bruce $200,350.00 pursuant to the terms of the Bruce
Note.  (<u>Id.</u> ¶ 56.)  Bruce received and has enjoyed the use of those funds, but
failed to make all required payments under the Note.  (<u>Id.</u> ¶¶ 57-58.)  Simpson
likewise failed to make payments on the Bruce Note pursuant to the Simpson
Guaranty of the Bruce Note.  (<u>Id.</u> ¶ 59.)  Thus, FDIC-R contends that Bruce is
in default under the Bruce Note and Simpson is in default under the Simpson
Guaranty of the Bruce Note for failure to make payments when due.  (<u>Id.</u> ¶¶ 60-
61.)  FDIC-R further contends that, to date, Bruce has failed to cure his default
of the Bruce Note, and Simpson has failed to cure his default of the Simpson
Guaranty of the Bruce Note.  (<u>Id.</u> ¶¶ 64-65.)

> B.      The Consolidation Note

In September 2009, CB&T agreed to make a loan for $11,148,173.00 to
consolidate, among other things, the Cleveland Motor Note, the Y&S Note, the
Simpson Note, and the Bruce Note (the "Consolidation Loan").  (<u>Id.</u> ¶ 70.)
FDIC-R contends, however, that CB&T agreed to make the Consolidation Loan
only on the condition that, <u>inter alia</u>, Bruce sign the Consolidation Note in his

individual capacity.  (Id.; see also Pl.'s Resp. to Defs.' Statement of Additional

Facts Which Are Material and Present a Genuine Issue for Trial ("Pl.'s Resp. to

Defs.' SAF"), Dkt. [94] ¶ 3 (admitting that Consolidation Loan was approved

by CB&T Board, but contending approval was subject to Bruce signing the loan

in his individual capacity).)  It is undisputed that "when Simpson and Bruce met

with Jan Garrison ('Garrison'), at that time a Senior Vice-President at CB&T, to

execute the Consolidation Loan, Bruce pointed out that if he was an individual

signatory on the Consolidation Loan, then it would be difficult for him to obtain

floor plan financing in his name."  (Pl.'s SMF, Dkt. [75-2] ¶ 70.)  Garrison said

she understood and would tell Charlie Miller, then Chief Executive Officer

("CEO") of CB&T, that this was "the way it has to be and that CB&T would

work that out."  (Id. ¶ 71.)  Thus, "the parties continued signing the loan

documents, except Bruce did not sign the Consolidation Note personally."  (Id.)

"After a few days, Simpson called CB&T and was told by Garrison the

Consolidation Note would have to go back before the Board of CB&T, but there

was no problem with the Consolidation Note."  (Id. ¶ 72.)

FDIC-R contends that "[n]either the CB&T loan committee nor the

CB&T board of directors ever approved the Consolidation Loan without Bruce

8

as an individual borrower and signatory" and, thus, "the Consolidation Loan was never finalized, funded, or 'booked.'"  (Id. ¶ 73.)  FDIC-R further contends that because "CB&T never funded the Consolidation Loan," it "never paid off the other loans, including the Cleveland Motor Note, the Y&S Note, the Simpson Note, and the Bruce Note, that the Consolidation Loan was intended to pay off."  (Id. ¶ 75.)

Defendants do not dispute that Bruce never signed the Consolidation Note in his individual capacity but deny that his personal signature was a condition of the CB&T Board's approval of the Consolidation Loan.  (Defs.' Resp. to Pl.'s SMF, Dkt. [87] ¶¶ 70, 71.)  Thus, Defendants contend that CB&T extended the Consolidation Loan to Defendants, thereby paying off "the prior loans and obligations of the Defendants" (i.e., the Notes and Guaranties). (Defs.' Statement of Additional Facts Which Are Material and Present a Genuine Issue for Trial ("Defs.' SAF"), Dkt. [88] ¶¶ 1-2.)  In support of this assertion, Defendants point out, for example, that "CB&T recorded deeds to secure debt as security for the Consolidation Loan."  (Id. ¶ 3.)

AO 72A
(Rev.8/82)

C.      The Parties' Claims

In its Complaint, FDIC-R raises claims for breach of contract arising out of the aforementioned Notes and Guaranties.  (See generally Pl.'s Am. & Consolidated Compl. ("Compl."), Dkt. [43].)  Defendants answered the Complaint and raised the following affirmative defenses: failure to state a claim upon which relief can be granted (first defense); unclean hands (second defense); set off (third defense); failure of consideration (fourth defense); accord and satisfaction (fifth defense); and, finally, that the "Financial Institutions Reform, Recovery, and Enforcement Act of 1989 violates the Defendants' constitutional rights, including but not limited to their due process rights as guaranteed by the Fifth and Fourth Amendments and further violates their equal protection rights" (sixth defense).  (Answer to Compl. ("Answer"), Dkt. [48] at 1-2.)  Defendants also asserted counterclaims for breach of contract (Count I); equitable relief (Count II); breach of fiduciary duty (Count III); and fraud in the inducement (Count IV).  (Counterclaim of Defs. ("Counterclaim"), Dkt. [48] at 18-41.)  FDIC-R now moves for summary judgment on its claims and on Defendants' counterclaims.  (See generally Dkt. [75].)

10

**Discussion**

I.    **Plaintiff's Motion for Summary Judgment [75]**

A.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome

11

of the suit under the governing law.  Id.  An issue is genuine when the evidence
is such that a reasonable jury could return a verdict for the non-moving party.
Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must
view all evidence and draw all reasonable inferences in the light most favorable
to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296
(11th Cir. 2002).  But, the court is bound only to draw those inferences which
are reasonable.  "Where the record taken as a whole could not lead a rational
trier of fact to find for the non-moving party, there is no genuine issue for trial."
Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).
"If the evidence is merely colorable, or is not significantly probative, summary
judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations
omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met
its burden under Rule 56(a), the nonmoving party "must do more than simply
show there is some metaphysical doubt as to the material facts").

12

B.    Analysis

As stated in the Background section, <u>supra</u>, FDIC-R moves for summary judgment on its claims for breach of contract and on Defendants' counterclaims. (<u>See generally</u> Dkt. [75].)  Defendants concede that their counterclaims fail as a matter of law.  (Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n Br."), Dkt. [86] at 12.)  Accordingly, FDIC-R's Motion for Summary Judgment on Defendants' Counterclaims is **GRANTED**.  The Court turns now to FDIC-R's Motion for Summary Judgment on its breach of contract claims.

To prevail on a claim for breach of contract, a claimant must establish that a breach of contract occurred and that the claimant suffered damages as a result.  <u>Rise v. GAPVT Motors, Inc.</u>, 653 S.E.2d 320, 322 (Ga. Ct. App. 2007). "A plaintiff seeking to enforce a promissory note establishes a prima facie case by producing the note and showing it was executed.  Once the prima facie case has been made, the plaintiff is entitled to judgment as a matter of law unless the defendant can establish a defense."  <u>Fielbon Dev. Co., LLC v. Colony Bank of Houston Cnty.</u>, 660 S.E.2d 801, 850 (Ga. Ct. App. 2008).  Similarly, a party seeking to enforce a guaranty agreement establishes a prima facie case by showing that the note and guaranty agreement were executed and that the maker

13

of the note defaulted thereunder.  <u>Shropshire v. Alostar Bank of Commerce</u>, 724

S.E.2d 33, 38-39 (Ga. Ct. App. 2012).

> 1. *Plaintiff's Prima Facie Case*

The Court finds that Plaintiff has established a prima facie case of

Defendants' liability under the Notes and Guaranties.  As set out in the

Background section, <u>supra</u>, it is undisputed that Simpson executed (1) the

Cleveland Motor Note in his capacity as President of CMC; (2) the Y&S Note

in his capacity as Vice President of Y&S; (3) the Simpson Unlimited Guaranty

of the Y&S Note in his individual capacity; (4) the Simpson Note in his

individual capacity; and (5) the Simpson Guaranty of the Bruce Note in his

individual capacity.  It is also undisputed that Bruce executed in his individual

capacity the (5) Bruce Unlimited Guaranty of the Y&S Note and (6) the Bruce

Note.  It is further undisputed that CB&T disbursed funds to Defendants in

accordance with the terms of the Notes, which funds Defendants received and

used.  Finally, it is undisputed that Defendants did not make all required

payments under the terms of the Notes and Guaranties.  The issue thus becomes

whether Defendants have established a defense to liability.

AO 72A
(Rev.8/82)

2.    *Defenses to Liability*

Defendants contend that they are not liable under the Notes or Guaranties because the Notes were paid in full by the Consolidation Loan.[2]  (See generally Defs.' Opp'n Br., Dkt. [86].)  To this end, Defendants dispute FDIC-R's assertion that the Consolidation Loan was approved only on the condition that Bruce sign it personally and, therefore, was never finalized or "booked" given Bruce's refusal to do so.  (Id.)  On the contrary, Defendants contend that CB&T agreed to extend the Consolidation Loan to Defendants, without requiring Bruce's individual signature, thereby extinguishing Defendants' obligations under the Notes and Guaranties.  (Defs.' Resp. to Pl.'s SMF, Dkt. [87] ¶¶ 70, 73-75; see generally Defs.' Opp'n Br., Dkt. [86].)  In support of this argument, Defendants point to the undisputed fact that after the parties (excluding Bruce in his individual capacity) signed the Consolidation Note, they executed deeds

---

[2] Each of Defendants' defenses—with the exception of their defense that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") is unconstitutional—hinges on the assertion that the Consolidation Loan paid the Notes in full and discharged Defendants' obligations under the Notes and Guaranties. The Court notes that in opposition to FDIC-R's Motion for Summary Judgment, Defendants do not assert the defense that FIRREA is unconstitutional.  Accordingly, the Court deems this defense abandoned.

15

to secure the debt, which CB&T recorded.[3]  (Defs.' SAF, Dkt. [88] ¶ 4; Defs.'

Opp'n Br., Dkt. [86] at 7, 17, 18.)

    FDIC-R contends that this defense is barred as a matter of law under the

---

[3] The Court notes, for example, the following testimony:

[CB&T's consent that Bruce not sign in his individual capacity] was purely an action.  However, I'll add to that that it could be considered . . . in writing based on we did sign several security deeds at that moment, at the time that 11 million dollar loan was signed.  So . . . at the moment we signed the loan, them asking us to sign a stack of security deeds and then immediately executing them, that would almost seem to me as that was in writing that they approved that it was fine for it not to be signed.

(6/19/12 Dep. of Mitchell C. Simpson ("Simpson Dep."), Dkt. [76-2] at 51:16-52:3.)

Q:    . . . [W]ould [CB&T] have recorded a security deed for eleven-plus-million dollars on an unapproved loan against one of its customers? . . . You've seen the security deed that was recorded for eleven-million dollars after the date of this commercial loan. Would [CB&T] have recorded an eleven-million dollar security deed against one of its customers' property if it had not made the loan?

A:    The loan was approved.  I mean the eleven-million dollars I've said was approved.

(8/22/11 Dep. of Charles Miller ("Miller Dep."), Dkt. [81] at 66:20-67:4.)  (See also 8/22/11 Dep. of Jan Garrison ("Garrison Dep."), Dkt. [84] at 92:7-15 (identifying security deeds executed in connection with the Consolidation Loan that encumber, among other properties, "every single piece" of Simpson's and Y&S's property and admitting that CB&T was not "in the habit of securing property when no loan existed.").)

16

"D'Oench, Duhme" doctrine[4] and 12 U.S.C. § 1823(e), which FDIC-R contends protect it from any claim or defense that does not "aris[e] from fully executed and properly documented contracts in the failed bank's files and records." (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), Dkt. [75-1] at 13.) FDIC-R argues that under the D'Oench, Duhme doctrine and section 1823(e), "when a federally insured bank fails, the bank's borrower may not later assert claims or defenses other than legal claims that are fully and properly documented in the failed bank's files." (Id. at 14.) Thus, FDIC-R argues, because CB&T's alleged agreement to extend the Consolidation Loan to Defendants without Bruce's individual signature was never memorialized in a writing, this alleged agreement cannot serve as a defense to Defendants' obligations under the Notes and Guaranties. (Id. at 16-17.)

The Court agrees with the legal principles articulated by FDIC-R. In D'Oench, the FDIC brought suit to collect on a promissory note acquired in a purchase and sale transaction. 315 U.S. at 455-56. The maker of the note asserted as a defense failure of consideration, arguing that the failed bank had

---

[4] This doctrine takes its name from the case in which was first enunciated, D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942).

17

orally promised the maker that it would not seek to collect the debt.  Id. at 456.

The Supreme Court rejected this defense, holding that a "'secret agreement'

outside the documents contained in the bank's records would not operate as a

defense against suit by the FDIC on a note acquired from a failed  bank."

Resolution Trust Co. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995)

(quoting D'Oench, 315 U.S. at 459.)  The Court explained the rationale of the

rule as follows:  "Public policy requires that a person who . . . executes an

instrument which is in form a binding obligation, should be estopped from

thereafter asserting that simultaneously the parties agreed that the instrument

should not be enforced."  D'Oench, 315 U.S. at 459.  Thus, the D'Oench,

Duhme doctrine protects FDIC-R from any claim or defense that is "based on

an alleged agreement which does not appear in the bank's records."  Victor

Hotel Corp. v. FCA Mortgage Corp., 928 F.3d 1077, 1081 (11th Cir. 1991).[5]

_____

[5] The D'Oench, Duhme doctrine is embodied in 12 U.S.C. § 1823(e), which
provides:

> No agreement which tends to diminish or defeat the interest of the
> Corporation [FDIC] in any asset acquired by it . . . either as security for
> a loan or as receiver of any insured depository institution, shall be valid
> against the Corporation unless such agreement—
>
> (A)     is in a writing,

18

The foregoing authority makes clear that the purpose of the <u>D'Oench, Duhme</u> doctrine is to protect the FDIC, in its capacity as receiver, from unrecorded side agreements, not contained in the failed bank's records, that would defeat or vary its rights or obligations under the terms of the debt instruments it has acquired.  As the Eleventh Circuit has explained,

> In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the bank's records.

<u>Baumann v. Savers Fed. Sav. & Loan Ass'n</u>, 934 F.2d 1506, 1515 (11th Cir. 1991).  FDIC-R argues that Defendants are trying to do exactly what the <u>D'Oench, Duhme</u> doctrine and section 1823(e) prohibit—avoid their obligations under the Notes and Guaranties on the basis of an unrecorded side

---

    (B)     was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

    (C)     was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

    (D)     has been, continuously, from the time of its execution, an official record of the depository institution.

19

agreement, in particular, CB&T's oral promise to extend the Consolidation

Loan without Bruce's individual signature.

The problem with FDIC-R's argument, however, is that issues of fact

exist as to whether the Consolidation Loan was ever contingent on Bruce's

individual signature.  FDIC-R has presented evidence that it was so contingent.

(See, e.g., Miller Dep., Dkt. [81] at 65:10-16 (testimony that Consolidation

Loan was contingent on Bruce signing in his individual capacity); Garrison

Dep., Dkt. [84] at 89:14-90:1, 90:8-19 (same).)   Defendants, however, have

presented evidence that it was not and that the Consolidation Loan was finalized

without Bruce's individual signature.  The Court notes, in particular, that the

Consolidation Loan was signed by Simpson and Bruce, in his capacity as owner

of Y&S, and that after the parties signed, they executed security deeds to secure

the eleven-plus million dollar debt, which deeds CB&T recorded.  (See, e.g.,

Simpson Dep., Dkt. [76-2] at 54:6-7; footnote 3, supra.)  Notably, FDIC-R has

not presented the Court with any writing memorializing the alleged condition

20

that Bruce sign the Note in his individual capacity before the Consolidation

Loan would be finalized.[6]

Viewing the record evidence in the light most favorable to Defendants,

the non-movants, the Court cannot find as a matter of law that the Consolidation

Loan was contingent on Bruce signing the Note in his individual capacity, such

that FDIC-R, after reviewing CB&T's records, would be aware of this

contingency and entitled to rely on it.  Thus, the Court cannot rule as a matter of

law that CB&T's alleged oral agreement to extend the loan without that

signature constitutes a "secret" or unrecorded side agreement, varying the terms

of the Consolidation Loan as it appeared in CB&T's records.  Thus, the Court

cannot find at this stage in the litigation that Defendants' defenses to liability

run afoul of the D'Oench, Duhme doctrine or section 1823(e).  Accordingly,

FDIC-R's Motion for Summary Judgment [75] is **DENIED**.

## II.    Defendants' Motion to Strike [89]

In light of the Court's ruling in Part I, supra, denying Plaintiff's Motion

for Summary Judgment, Defendants Motion to Strike is **DENIED as moot**.

_____

[6] Indeed, FDIC-R has not presented the Court with a copy of the Consolidation
Loan or any other supporting documentation.

21

## Conclusion

In accordance with the foregoing, Plaintiff's Motion for Summary Judgment [75] is **DENIED** and Defendants' Motion to Strike Affidavit of Robert K. Beaty in Support of Plaintiff's Motion for Summary Judgment [89] is **DENIED as moot**.

**SO ORDERED**, this  29th  day of March, 2013.

**RICHARD W. STORY**
United States District Judge

22